## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| | ) | Case No. |
| Rachael Johnson and Reade Adams, individually, and on behalf of those similarly situated, | ) ) ) | |
| | ) | **COMPLAINT - CLASS ACTION** |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| Hennepin Healthcare System, Inc., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

Plaintiffs Rachael Johnson and Reade Adams ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys of record, assert the following against Defendant Hennepin Healthcare System, Inc., d/b/a Hennepin Healthcare ("Hennepin" or "Defendant").

## INTRODUCTION

1.     This class action arises out of Hennepin's unlawful use of third-party tracking technologies (the "Tracking Tools") to surreptitiously intercept and disclose its patients' private and protected communications, including communications concerning highly sensitive personal health information, to third parties, without patients' knowledge or consent. By purposely embedding and deploying the Tracking Tools on Hennepin's web properties, Hennepin engages in the unauthorized disclosure of its patients' highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Personal Information") to third parties, including, but not limited to, Meta

Platforms, Inc. d/b/a/ Meta ("Facebook") and Google LLC ("Google").[1] Such disclosures of Personal Information violate state and federal law.

2.      Hennepin is an integrated healthcare system that operates a trauma center, hospital, and multiple primary care clinics in Minneapolis and throughout Hennepin County.   Hennepin provides services to thousands of patients and generates over $1 billion in annual revenue.   In its ordinary course of business, Hennepin encourages patients and prospective patients to use www.hennepinhealthcare.org (the "Website"), and a patient portal, https://mychart.hcmc.org/MyChart/ (the "Portal" and collectively with the Website, the "Web Properties"), to communicate about symptoms and conditions, research treatments, lookup physicians, and schedule appointments.   Unbeknownst to its patients and prospective patients, these communications are intercepted and disclosed to third parties through Hennepin's use of the Tracking Tools.

3.      One of the Tracking Tools Hennepin deployed on its website is the Meta Pixel ("Pixel").[2] Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to a third party, like Meta. This includes tracking and logging pages and subpages the website user visits during a

---

[1] While this complaint focuses on tracking tools from Facebook and Google, research shows that Defendant also embedded tracking codes from a number of other marketing companies including DoubleClick Ads, LinkedIn, Alphonso, Federated Media, IDS, Pubmatic, ShareThis, The Trade Desk, Deep Intent, AppNexus, lhmos.com, Media6Degrees, and BidSwitch.

[2] Meta also provides other tracking technologies that give the same or similar tracking functionalities as Pixel, including, but not limited to, Conversions API, SDKs, and Audiences. Absent discovery, Plaintiffs are unable to independently confirm whether Defendant installed such tracking technologies on the Website.

website session that reveal patient status and other personal identifying and protected health information, searches, and other submissions to the website, which in many cases includes sensitive personal and identifying information that is not anonymized. Indeed, Pixel is routinely used to target specific individuals by utilizing the data gathered through Pixel to build profiles for the purpose of future targeting and marketing. Here, the information transmitted to third-party Meta without Plaintiffs' consent included private health information,[3] which is some of the most personal and sensitive data Plaintiffs have.

4.    Additionally, when a patient communicates with Hennepin's Web Properties where Pixel is present, Pixel source code causes the exact content of the patients' communications with the Website to be re-directed to Meta in a way that identifies the person as a patient. Here, for example, Plaintiffs used the Website to communicate about their sensitive health conditions and symptoms, research potential treatments and physicians, and make appointments. Unbeknownst to Plaintiffs, when they communicated about their personal health information, Pixel secretly intercepted, recorded, and transmitted those private communications to Meta along with unique identifiers Meta could use to identify Plaintiffs. Specifically, Defendant used Pixel to intercept its users' sensitive

---

[3] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

communications and have those communications associated with Facebook user profiles for purposes of future ad targeting and marketing.

5.     As a result of Defendant's use of Pixel, Plaintiffs' and Class Members' Personal Information, including, but not limited to, computer IP addresses; patient status; health conditions and symptoms; treatments; physicians; appointment details; and unique personal identifiers used to link the sensitive web communications to Plaintiffs and the Class, was compromised and disclosed to third parties such as Meta without authorization or consent.

6.     Such private information would allow Meta to know that a specific patient was seeking confidential health care or exploring treatment for a specific condition.

7.     Defendant's Tracking Tools have also transmitted patients' Personal Information to additional unauthorized third parties for marketing and advertising purposes, including Google.

8.     Google's tracking technologies operate much like the Meta Pixel.  As one District Court recently described:

> Whenever a user visits a website that is running Google Analytics, Ad Manager, or some similar Google service, Google's software directs the user's browser to send a separate communication to Google. This happens even when users are in private browsing mode, unbeknownst to website developers or the users themselves. The operation is not in dispute. When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. At the same time, the user's

browser reads Google's code, which is embedded on the website. Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. This second transmission tells Google exactly what a user's browser communicated to the website.[4]

9.    In secretly deploying the Tracking Tools on its Website to intercept and disclose website communications concerning its patients' and prospective patients' Personal Information, Defendant acted with a tortious and criminal purpose in violation of state and federal laws.

10.    Plaintiffs and the Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Personal Information to anyone other than those reasonably believed to be part of Hennepin, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' and the Class Members' Personal Information to Meta, Google, and other potential third parties.

11.    Given the nature of Meta and Google's businesses as two of the world's largest online advertising companies, Plaintiffs' and the Class Members' Personal Information can and will likely be further used by or exposed to additional third parties.

12.    As a direct and proximate result of Defendant's unauthorized exposure of Plaintiffs' and the Class Members' Personal Information, Plaintiffs and the Class Members have suffered injury, including an invasion of privacy; loss of the benefit of the bargain

---

[4] *Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *2 (N.D. Cal. Aug. 7, 2023). As explained by the Court in *Brown*, Google connects user data to IP addresses; IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifiable information that constitutes one of the 18 HIPAA identifiers of PHI. *See* 45 C.F.R. § 164.514 (2).

Plaintiffs and the Class Members considered at the time they bargained for healthcare services and agreed to use Defendant's Website for services; statutory damages; and the continued and ongoing risk to their Personal Information.

13.    Accordingly, Plaintiffs bring this action individually, and on behalf of a Class of similarly situated individuals, to recover for harms suffered and assert the following claims: Violations of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511); the Minnesota Protection of Communications Act ("MPCA"); Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Mn. Stat. §325D.43-48; the Minnesota Consumer Fraud Act ("MCFA"); and the Minnesota Health Records Act ("MHRA").

## PARTIES

14.    **Plaintiff Rachael Johnson** is a natural person who resides and intends to remain in Minnesota. At all relevant times, Johnson was a citizen of Minnesota.

15.    **Plaintiff Reade Adams** is a natural person who resides and intends to remain in Minnesota. At all relevant times, Adams was a citizen of Minnesota.

16.    **Defendant Hennepin Healthcare System, Inc.,** is a Minnesota nonprofit corporation headquartered at 701 Park Ave., Minneapolis, MN 55415.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this Complaint asserts claims pursuant to Defendant's violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511.

18.    This court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

19.    This Court has personal jurisdiction over Defendant because Hennepin is a Minnesota nonprofit corporation with its principal place of business in this District.

20.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) – (2) because Defendant's principal place of business is in this District and because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

A.    **Federal Regulators Have Warned Healthcare Providers About the Impermissible Use of Tracking Technologies**

21.    The surreptitious collection and disclosure of Personal Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the U.S. Department of Health and Human Services ("HHS") have recently reiterated the necessity for data security and privacy concerning health information.

22.    For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health

or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[5]

23.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—companies that provide healthcare services that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.** In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out. [Recent    FTC    enforcement    actions    such    as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[6]

24.    In December 2022, HHS similarly warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[7]   The HHS Privacy Bulletin also made clear that,

---

[5] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited Apr. 28, 2024).

[6] *Id.* (emphasis added).

[7] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin"). The original guidance was issued in December 2022 and was recently updated in March 2024.

"disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[8]

25.    In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Personal Information to third parties.[9]  The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[10]  According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[11]

26.    In March 2024 the OCR reiterated its warning to healthcare providers, stating that "[w]hile it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for

---

[8] *Id.*
[9] https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information
[10] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf
[11] *Id.*

regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule."[12]

27.    Despite these clear warnings from federal regulators, Defendant Hennepin embedded Tracking Tools on its Website to secretly track its patients' communications regarding healthcare information and disclose those communications to third parties.

**B.    The Meta Pixel**

28.    Through its Web Properties, Defendant connects Plaintiffs and the Class Members to Defendant's digital health care platforms with a core goal of increasing profitability.

29.    In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely embedded and deployed Meta Pixel on its Website and, upon information and good faith belief, its MyChart patient Portal.[13] By doing so, Defendant surreptitiously shared its patients' and prospective patients' identities and online activity, including private communications and search results related to conditions, symptoms, treatments, and physicians, with Meta.

---

[12] *See supra*, note 8 (emphasis in original).

[13] At the time of filing this complaint, Plaintiffs are unable to determine whether Pixels were embedded inside Defendant's MyChart Portal. However, given Defendant's use of the Meta Pixel on other pages of the Website *including the log-in page for its patient Portal*, Plaintiffs reasonably believe and, therefore, aver that Defendant used the Pixels to track information on its entire digital platform, including inside its MyChart Portal. *See also* Todd Feathers, *et al.*, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022) (listing examples of hospitals that used third party trackers inside password-protected patient portals), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

30.   Meta's core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates by using algorithms that approve and deny ads based on the ads' content, human moderators that further review ads for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

31.   Over the last decade, Facebook, now Meta, has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

32.   Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

33.   One of Meta's most powerful advertising tools is the Meta Pixel (formerly the "Facebook Pixel"), which it first launched in 2015.

34.   Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." Meta further stated:

Facebook pixel, [is] a new way to report and optimize for conversions, build audiences[,] and get rich insights about how people use your website. We're

11

also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.

Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel. You only need to place a single pixel across your entire website to report and optimize for conversions. Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.
[Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (*e.g.*, Purchase) to your Facebook pixel base code on appropriate pages (*e.g.*, purchase confirmation page).[14]

35.　　Pixel is an easily attainable piece of code that Meta makes available to website developers for free. In exchange, at a minimum, website developers must agree to Meta's Business Tool Terms.[15]

36.　　The Business Tool Terms note that the Meta's Business Tools, including Pixel, will capture two types of information: "Contact Information" which "personally identifies individuals," and "Event Data" which contains additional information about people and their use of a developer's website.[16]

---

[14] Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015), https://developers. facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited Apr. 24, 2024).

[15] *See* Meta Business Tool Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ 1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data") (last visited Apr. 28, 2024).

[16] *Id.* at Section 1(a)(i)-(ii)

37.    The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[17]

38.    However, even with all of these protocols in place, Meta flatly prohibits the disclosure of Business Tools Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[18]

39.    After agreeing to the Business Tools Terms, website developers can choose to install and use Pixel on their websites to track and measure certain actions, such as a website visitor's text searches and page views, including the detailed URLs triggered by page views. When a website visitor takes an action a developer chooses to track on its website, Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

40.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smart phone) accesses web content

---

[17] *Id.* at Section 3(c)(i)
[18] *Id.* at Section 1(h).

through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

41.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

42.     Ultimately, a browsing session online may consist of thousands of web communications. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- An **HTTP Request** is an electronic communication a website visitor sends from his device's browser to the website's server. There are two types of HTTP Requests: (1) GET Requests, which are one of the most common types of HTTP Requests—in addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies; and (2) POST Requests which can send a large amount of data outside of the URL. In this case, a patient's HTTP Request would be asking Defendant's Website to get certain information, such as a list of clinic locations or prescriptions. So that servers can better understand what information users are requesting, HTTP Requests also use URLs that contain parameters, which use variables and assigned values in the URL to pass additional information through the HTTP Request.

- **Cookies** are a text file that website operators and others use to store information on the website visitor's device; these can later be communicated to a server or servers. Cookies are sent with HTTP Requests from website visitor's devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Third-party cookies are created by a website with a domain name other than the one the user is visiting, in this case Meta.[19] There are also "first-party cookies," like the fbp cookie, which is created by

---

[19] *Third-Party Cookie*, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last visited Apr. 29, 2024). This is also confirmable using web developer tools to inspect a website's cookies and track network activity.

the website the user is visiting, in this case Defendant.[20] Meta uses both first-
and third-party cookies in Pixel to link Facebook IDs and Facebook profiles,
and Defendant sends these identifiers to Meta.

- An **HTTP Response** is a response to an HTTP Request. It is an electronic
communication that is sent as a reply to the website visitor's device's web
browser from the host server. HTTP responses may consist of a web page,
another kind of file, text information, or error codes, among other data.
Basically, the HTTP Response is when the website sends the requested
information (*see* the HTTP Request); this is sometimes called the "Markup."

43.    A user's HTTP Request essentially asks the Defendant's Website to retrieve

certain information (such as "Orthopedics"). The HTTP Response then renders or loads the

requested information in the form of Markup (i.e., the pages, images, words, buttons, and

other features that appear on the patient's screen as they navigate Defendant's Website).

44.    Every website, including Defendant's, is composed of Markup and "Source

Code." Source code is a set of instructions that commands the website visitor's browser to

take certain actions when the web page loads or when a specified event triggers the code.

45.    Source code may also command a web browser to transmit data to third

parties in the form of an HTTP Request. Such data transmissions allow a website to export

data about users and their actions to third parties. Third parties receiving this data are

typically configured to track user data and communications for marketing purposes.

46.    Transmission of a such data can be done quietly in the background without

notifying the web browser's user. The pixels are invisible to website users and thus, without

any knowledge, authorization, or action by the user, the website site developer (or website

---

[20] *First-Party Cookie*, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last
visited Apr. 30, 2024). This is also confirmable using web developer tools to inspect a
website's cookies and track network activity.

commander) can use its source code to contemporaneously and to invisibly re-direct the user's PII and other non-public medical information to third parties. Through Pixel, Defendant uses source code that can accomplish just that.

47.    Pixel "tracks the people and the types of actions they take."[21] According to Meta, Pixel is a piece of code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[22] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Defendant.

48.    Through this online tracking technology, Meta intercepts each page a user visits, what buttons they click, as well as the specific information the user inputs into the website and other searches conducted. Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address. Meta stores this data on its own servers, in some instances for years on end, and independently uses the data for its own financial gain.

49.    Importantly, this data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account (or has been logged in recently) when the user visits Defendant's website, Meta receives third-party cookies allowing Meta to link the data collected by Pixel to the specific Facebook user. In other words, a user's personal and private information sent by the Meta Pixel to Facebook is sent

---

[21] *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting (last visited Apr. 30, 2024).
[22] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Apr. 30, 2024).

alongside that user's personal identifiers, including IP address and cookie values, which can be linked to the user's unique Facebook account.

50. Meta accomplishes this by placing cookies in the web browsers of users logged into their services, which aids Meta in identifying users.

51. One such example is the "c_user" cookie, which is a type of third-party cookie assigned to each person who has a Facebook account. The "c_user" cookie contains a numerical value known as the Facebook ID ("FID") that uniquely identifies a Facebook user. It is composed of a unique and persistent set of numbers. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly, and easily, locate, access, and view the user's corresponding Facebook profile. Thus, when a Facebook user visits Defendant's Website while logged in to their Facebook account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

52. Even if a user does not have a Facebook account or is not logged in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user

who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via Pixel and "_fbp" cookie to the newly created account.

53.    Meta's Business Tools Terms make clear that Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[23]

54.    After Meta is finished processing users' intercepted information, it makes the relevant analytics available to Hennepin through Meta's Event Manager tool.

55.    Using the Events Manager, Hennepin can and is intended to review a summary of users' activity, including the pages, parameters and URLs sent through Pixel,[24] as well as any included metadata.[25]

56.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications

---

[23] *Meta Business Tool Terms, Section 2(a)(i)(1)*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ 1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr (last visited Apr. 30, 2024).

[24] *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . ." ) (last visited Apr. 30, 2024).

[25] A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142 (last visited Apr. 30, 2024).

to Meta. Meta then uses the information transmitted by Pixel to match the user with their

Facebook ID.

57.    Judge William H. Orrick on the U.S. District Court for the Northern District

of California summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following
> scenario. A shoe company wishes to gather certain information on customers
> and potential customers who visit its website. The shoe company first agrees
> to Meta's Business Tools Terms (discussed below), which govern the use of
> data from the Pixel. The shoe company then customizes the Meta Pixel to
> track, say, every time a site visitor clicks on the "sale" button on its website,
> which is called an "Event." Every time a user accesses the website and clicks
> on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which
> then sends certain data to Meta. Meta will attempt to match the customer data
> that it receives to Meta users—Meta cannot match non-Meta users. The shoe
> company may then choose to create "Custom Audiences" (i.e., all of the
> customers and potential customers who clicked on the "sale" button) who
> will receive targeted ads on Facebook, Instagram, and publishers within
> Meta's Audience Network. Meta may also provide the shoe company with
> de-identified, aggregated information so the shoe company understands the
> impact of its ads by measuring what happens when people see them. Meta
> does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2

(N.D. Cal. Dec. 22, 2022) (internal citations omitted).[26]

58.    Pixel also allows a company, like Defendant, to impact the delivery of ads,

measure cross-device conversions, create custom audiences, and save money on

---

[26] In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced
the declaration of expert Richard M. Smith, which provides further details on the manner
in which the challenged Pixel technology works and Meta's arrangements with health
providers that employ it. 2022 WL 17869218, at *2. *See* Declaration of Richard M. Smith,
filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

advertising and marketing costs.[27] But, most relevant here, Pixel allowed Defendant and Meta to track website users secretly on Defendant's Web Properties and intercept their communications with Defendant.

59.    When visitors to Defendant's Web Properties, like Plaintiffs and the Class Members, communicated with Defendant or inquired about personal health-related topics, that information was transmitted to and intercepted by Meta.

60.    The Personal Information intercepted, recorded, and transmitted to Meta includes, but is not limited to, exact search terms and search results; patient status; health symptoms; health conditions; possible treatments; appointment details; physicians and locations sought.  During that same transmission, Defendant would also provide Meta with the patient's Facebook ID number, other persistent cookies, device ID, computer IP addresses, or other PII. This information makes it easy to link private communications with Defendant via the Web Properties to a specific and identifiable Facebook user.

61.    Once Meta has that data, it processes it, analyzes it, and assimilates it into databases like Core Audiences or Custom Audiences for advertising purposes. If the website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies the user's name and Facebook profile. In sum, Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Web Properties visitors communicated, viewed, or otherwise interacted with on Defendant's Web Properties.

---

[27] *Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2 (last visited Apr. 30, 2024).

C.     **Google Tracking Code**

62.   Like the Meta Pixel, Google creates code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

63.   The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site.  In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

64.   Like with the Meta Pixel, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

D.     **Hennepin Deploys Third-Party Tracking Technologies To Intercept and Disclose Personal Information**

65.   As an example of how the Meta Pixel operated on Defendant's Web Properties, consider a visitor who opens Defendant's Website, and uses the search bar to search for "cancer." The search result takes the visitor to the https://www.hennepinhealthcare.org/?s=cancer webpage.  When doing so, the visitor's

browser sends a GET Request to Defendant's server, requesting that server to load the

webpage displayed below in ***Figure 1***:



*Figure 1: Depiction of "Cancer" Search Result Webpage*

66.    At the same time, Pixel causes the visitor's browser to secretly intercept and

record the visitor's communication with Defendant's Website, including the specific URL

requested, and transmit the private communication to Meta along with unique identifiers

used to link the communication to a specific Facebook user, as shown in ***Figure 2***:



*Figure 2: Depiction of information intercepted and recorded by Meta.*

67.    As reflected in **Figure 2**, the "dl" path shows the specific URL for the page requested by the visitor's browser, including the substantive description and/or disclosure of the visitor's search for "cancer."  This transmission, as explained herein, also contains the Pixel's transmission of the _fbp cookie, the c_user cookie (the Facebook ID), and other cookies and identifiers used to identify the website visitor by name and Facebook account. Thus, the fact that a patient or prospective patient is using or considering using Hennepin for healthcare services related to cancer is transmitted to Meta. Disclosure of that information reveals to Meta the website visitor's status as a patient or prospective patient with Hennepin, seeking services or treatment for cancer.

68.    If that same patient inquired about specific cancer treatment center or a provider specializing in cancer, the Pixel would likewise intercept those communications and transmit them to Meta along with the patient's unique identifiers, as reflected in **Figures 3-6** below:



*Figure 3: Depiction of search for "Comprehensive Cancer Center"*



*Figure 4: Depiction of search for cancer provider with Private Information disclosed via a 'Microdata' event*



***Figures 5-6: Depiction of search for cancer provider with Private Information
(including the c_user and the _fbp cookies) disclosed via a 'PageView' event***

69.     The Website provides an option for patients to click a button to call and make an appointment with a particular specialist. If the patient did click on the phone number to make an appointment, the Pixel would likewise intercept those communications, including the inner text of the button (here, the phone number for appointments with the provider) and transmit them to Meta along with the patient's unique identifiers, as reflected below:



***Figure 7: Depiction of a SubscribedButtonClick "event" disclosing that the patient is attempting to make an appointment after looking up the "Comprehensive Cancer Center."***

70.     Hennepin's deployment of the Google tracking code works in much the same way. If a patient inquired about brain injuries and symptoms, the patient's browser would send a GET request to Defendant's server to load the following webpage, as reflected in ***Figure 8***:



*Figure 8: Depiction of Brain Injury Webpage*

71.    Because Defendant's Website deploys the Google tracking code, the patient's private communications to Defendant's Website are also intercepted and transmitted to Google along with unique identifiers used to link the communications to a specific Google user:



***Figure 9: Depiction of "Brain Injury" Search Disclosed to Google***

dl: https://www.hennepinhealthcare.org/?s=brain+injury

dr: https://www.hennepinhealthcare.org/

dt: You searched for brain injury - Hennepin Healthcare

en: page_view

***Figure 10: Closeup of source code in Figure 9***

72.    Also like the Meta Pixel, the Google tracking tools intercept a patient's act of looking up a specific physician and/or attempting to make an appointment, as reflected in ***Figures 11-12*** below:

dl: https://www.hennepinhealthcare.org/provider/allison-foy-phd/

dr: https://www.hennepinhealthcare.org/find-a-provider/?hcmc_provider_specialty=881

dt: Allison Foy, PhD - Hennepin Healthcare

en: page_view

***Figure 11: Depiction of Provider Search Result Transmitted to Google***

```
dl: https://www.hennepinhealthcare.org/make-an-appointment/
dr: https://www.hennepinhealthcare.org/provider/allison-foy-phd/
dt: Make an appointment - Hennepin Healthcare
```

***Figure 12: Depiction of Appointment Request Transmitted to Google***

73.    Based on the above examples of how the Tracking Tools operate on Hennepin's Website, Meta and Google would know (1) that a particular individual—who Meta and Google could identify based on their respective accounts—was a patient or prospective patient of Hennepin seeking healthcare services, (2) that the named patient searched for information regarding cancer or brain injuries, (3) that the named patient inquired about specific physicians, and (4) that the patient in question was attempting to make an appointment with specific physicians. Meta and Google would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone. Using this Personal Information, the technology companies could put the named patient into a Core or Custom Audience for purposes of targeted advertising by Hennepin or any other company seeking to advertise its services or products to individuals that fit the named patient's profile.

74.    In this way, Hennepin, Meta, Google, and other third parties profit off of Plaintiffs' and Class Members' Personal Information without their knowledge, consent, or authorization.

75.    Defendant deprived Plaintiffs and the Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed Plaintiffs' and other online patients' and prospective

patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to Meta and Google—unauthorized third parties; and (c) failed to provide notice to or obtain the consent from Plaintiffs and the Class Members to share their Personal Information with others.

## E.    Plaintiffs' Experiences with Hennepin

### *Plaintiff Rachel Johnson*

76.    Plaintiff Rachael Johnson has been a patient of Hennepin since approximately 2020.

77.    Plaintiff has visited and utilized Defendant's Website multiple times between 2020 and the present, with the most recent visit in or about May 2024.

78.    As a condition of receiving Defendant's services, Plaintiff disclosed her Personal Information to Defendant on numerous occasions when visiting the Website.

79.    Plaintiff accessed Defendant's Website on her cell phone to receive healthcare services from Defendant and at Defendant's direction.

80.    Plaintiff has used and continues to use the same device to maintain and access active Facebook, Instagram, and Google accounts throughout the relevant period in this case.

81.    During the relevant time period, when the Defendant's Tracking Tools were present, Plaintiff used the Website "search" bar to search for and type in information related to her medical conditions, including ███████████████████████████. She also searched for specific providers, including █████████████. After receiving test

results through Hennepin, Plaintiff also researched specific terms referenced in the test results using the Hennepin Website.

82.    In addition, Plaintiff communicated with and made appointments with her healthcare providers through the MyChart patient portal.

83.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's prospective healthcare providers, medical conditions and treatments sought, patient status, and appointment details. The following long-URLs or substantially similar URLs were sent to Meta via the Pixel:



84.    Contemporaneously with the interception and transmission of Plaintiff's communications on https://www.hennepinhealthcare.org regarding her PHI, Defendant also disclosed to Meta Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

85.     Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

86.     Plaintiff provided her Personal Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

87.     As described herein, Defendant worked along with Meta and Google to intercept Plaintiff's communications, including those that contained her Personal Information.

88.     Defendant willfully facilitated these interceptions without Plaintiff's knowledge, consent or express written authorization.

89.     Right after or soon after submitting her Personal Information to Defendant, Plaintiff began to receive ads on her Facebook and Instagram accounts from Hennepin. Plaintiff also received ads on her Facebook and Instagram accounts related to her underlying health conditions.  Plaintiff also received ads from Hennepin and ads related to her health conditions while browsing the internet.

90.     Defendant did not inform Plaintiff that it had shared her Personal Information with Meta and Google.

91.     By doing so without her consent, Defendant breached Plaintiff's privacy and unlawfully disclosed her Personal Information.

92.     Plaintiff would not have paid (or would have paid substantially less) for Defendant's services, including her visits to Defendant's providers, tests and treatments sought, had she known that her PHI was being disclosed to unauthorized third parties like Facebook.

### Plaintiff Reade Adams

93.     Plaintiff Reade Adams has been a patient of Hennepin since approximately 2014.

94.     Plaintiff has visited and utilized Defendant's Website multiple times between 2014 and 2024.  Plaintiff uses Defendant's Website once or twice per month and visited the Website most recently in or about May 2024.

95.     As a condition of receiving Defendant's services, Plaintiff disclosed her Personal Information to Defendant on numerous occasions.

96.     Plaintiff accessed Defendant's Website on her cell phone, personal computer and iPad to receive healthcare services from Defendant and at Defendant's direction.

97.     Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

98.     During the relevant time period, when the Defendant's Tracking Tools were present on the Website, Plaintiff used the Website "search" bar to search for and type in information related to her medical conditions and healthcare providers. Plaintiff used the public-portion of the Website to search for providers, including ██████████ ████████████████████████████████████████████████.  She also logged in to the MyChart patient portal to schedule appointments.

99.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Meta can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiff's prospective healthcare providers, medical conditions and treatments sought, patient status, and appointment details. The following long-URLs or substantially similar URLs were sent to Meta via the Pixel:



100.    Contemporaneously with the interception and transmission of Plaintiff's communications on https://www.hennepinhealthcare.org regarding her PHI, Defendant also disclosed to Meta Plaintiff's personal identifiers, including but not limited to her IP address and Facebook ID.

101.    Plaintiff reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

102.   Plaintiff provided her Personal Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

103.   As described herein, Defendant worked along with Meta and Google to intercept Plaintiff's communications, including those that contained her Personal Information.

104.   Defendant willfully facilitated these interceptions without Plaintiff's knowledge, consent or express written authorization.

105.   Defendant did not inform Plaintiff that it had shared her Personal Information with Facebook.

106.   By doing so without her consent, Defendant breached Plaintiff's privacy and unlawfully disclosed her Personal Information.

107.   Plaintiff would not have paid (or would have paid substantially less) for Defendant's services, including her visits to Defendant's providers, tests and treatments sought, had she known that her PHI was being disclosed to unauthorized third parties like Facebook.

**F.    Defendant's Conduct Violates its Own Privacy Policies and Promises**

108.   Defendant's privacy policies represent to Plaintiffs and Class Members that Defendant will keep Personal Information private and confidential and Hennepin will only disclose Personal Information under certain circumstances.

109.    Defendant's Privacy Policy represents to patients and Website visitors that Defendant will keep PHI confidential and will only disclose it under certain circumstances, none of which apply here.[28]

110.    Defendant affirmatively represents that it "***will not use or disclose your health information for marketing, for a sale of health information, or for most sharing of psychotherapy notes, unless we have permission from you***."[29]

111.    Defendant also publishes a Website Privacy Policy that represents to patients and Website visitors that Defendant will keep sensitive information confidential and will only disclose Personal Information under certain circumstances, none of which apply here.[30]

112.    Defendant's Website Privacy Policy explains Defendant's legal duties with respect to Personal Information and the exceptions for when Defendant can lawfully use and disclose Plaintiffs' and Class Members' Personal Information:

> Your privacy is important to us. . . "Personal Information" is information that you provide about yourself or information that can be used to identify or contact you. This may include an address, phone number, email address, and other information when associated with a person's name. [31]
> . . .

113.    Hennepin's examples of how and where it collects Personal Information do not include patients' searches for specific medical conditions, treatments, providers,

---

[28] Hennepin's Notice of Privacy Practices, https://www.hennepinhealthcare.org/privacy-practices/ (last visited May 7, 2024).
[29] *Id.* (emphasis added).
[30] Hennepin Healthcare Website Privacy Policy, https://www.hennepinhealthcare.org/privacy-policy (last visited May 7, 2024).
[31] *Id.*

appointment details, nor does Defendant disclose that it will collect PHI and PII and send it to third-party data brokers such as Meta, for marketing purposes. In fact, Hennepin represents the opposite:

> ***We do not sell or rent your Personal Information to other parties, nor do we share it with them for their own direct marketing purposes***. We may disclose your Personal Information to third parties who complete transactions or perform services on our behalf or for your benefit.
>
> We may disclose your Personal Information to legal or government regulatory authorities in response to their requests for such information or to assist in investigations of theft, fraud or abuse; or to third parties in connection with claims, disputes or litigation, if we are required by law to do so. We may also disclose your Personal Information if we determine its disclosure is necessary in an emergency.[32]

114.    The Website Privacy Policy further affirmatively represents: "[w]e do not use web beacons or other technology that could identify you."[33]

115.    Hennepin's Website Privacy Policy also states that Hennepin may use information gathered through the Website "to create a compiled, aggregate view of the audience and visitor usage patterns. We use aggregated and/or de-identified information in our analysis to better understand the visitors to our website as we develop new products and services. ***We may also share aggregated and/or de-identified information with our third-party service vendors. Aggregate and de-identified information is not personally identifiable.***"[34]

---

[32] *Id*. (emphasis added).

[33] *Id*. 'Web Beacons" is typically another way to refer to pixels. *See* https://www.cookiepro.com/knowledge/what-is-a-web-beacon/ (last visited May 7, 2024).

[34] *Id*.

116.    Defendant's Privacy Policies do not permit Defendant to intercept, transmit, and/or disclose Plaintiffs' and Class Members' Personal Information to third parties, including Meta, for marketing purposes.

117.    Further, while Defendant's Website Privacy Policy states that Defendant uses Google Analytics "that helps [Hennepin] understand how visitors use our website and provides searching capabilities on the website,"[35] Google specifically advises its customers that they "must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies."[36]

118.    Defendant violated its own Privacy Policies by unlawfully intercepting and disclosing Plaintiffs' and Class Members' Personal Information to Meta and other third parties without adequately disclosing that it shares Personal Information with third parties and without acquiring the specific patients' consent or authorization to share the Personal Information.

**G.    Exposure of Personal Information Creates a Substantial Risk of Harm**

119.    The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former

---

[35] *Id.*

[36] *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en ("[f]or HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS Bulletin provides specific guidance on when data may and may not qualify as PHI") (last visited Apr. 30, 2024).

Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[37]

120.    The FTC also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[38]

121.    The FTC cautions businesses that failure to protect Personal Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[39] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

---

[37] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, at 2 (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Apr. 30, 2024).

[38] *Start With Security, A Guide for Business,* https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Apr. 30, 2024).

[39] *See Taking Charge: What to Do if Your Identity is Stolen*, FTC, at 2 (2012), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited Apr. 30, 2024).

**H.      Plaintiffs' and the Class' Personal Information is Valuable**

122.   As many health care data industry experts have recognized, "[p]atients' medical data constitutes a cornerstone of the big data economy. A multi-billion dollar industry operates by collecting, merging, analyzing[,] and packaging patient data and selling it to the highest bidder."[40]

123.   Thus, the personal, health, and financial information of Plaintiffs and the Class Members is valuable and has become a highly desirable commodity. Indeed, one of the world's most valuable resources is the exchange of personal data.[41]

124.   Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[42] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[43]

---

[40] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/ (last visited Apr. 30, 2024).
[41] *The world's most valuable resource is no longer oil, but data* (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Apr. 30, 2024).
[42] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)* (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html (last visited Apr. 30, 2024).
[43] *Id.*

125.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who "leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[44]

126.    In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[45] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[46]

127.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[47]

---

[44] Brad Brown, et al. *Capturing value from your customer data* (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (last visited Apr. 30, 2024).

[45] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220, OECD PUBLISHING PARIS (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf (last visited Apr. 30, 2024).

[46] *Id.* at 25.

[47] *Id.*

128.    Unlike financial information, such as credit card and bank account numbers, the PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[48]

129.    Consumers place considerable value on their Personal Information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Personal Information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against errors, improper access, and secondary use of personal information is worth between US$30.49 and $44.62.[49] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

130.    Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[50]

---

[48] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Apr. 30, 2024).
[49] Il-Horn Hann, Kai-Lung Hui *et al.*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17, Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Apr. 30, 2024).
[50] *See* https://time.com/4588104/medical-data-industry/ (last visited Apr. 16, 2023).

131.     Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[51]

132.     Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.  "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[52]

133.     There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy.  Many companies, like Marriott, collect personal information.  Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

---

[51]*See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Apr. 30, 2024).
[52] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited Apr. 30, 2024).

134.     Several companies have products through which they pay consumers for a license to track their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

135.     Facebook also has paid users for their digital information, including browsing history.  Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

136.     Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[53]

137.     Defendant's privacy violations exposed a variety of Personal Information, including patient status, health conditions and symptoms, physicians, and other highly sensitive data.

138.     PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[54] PHI can be ten times more valuable than credit card information.[55]  This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed

---

[53] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[54] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text= (U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market. (last visited Apr. 30, 2024).

[55] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Apr. 30, 2024)).

or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[56]

139.    Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[57] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[58]

## I.    Plaintiffs and the Class Had a Reasonable Expectation of Privacy in Their Interaction with Defendant's Web Properties

140.    Consumers assume the data they provide to hospitals will be kept secure and private.

141.    In a recent survey related to Internet user expectations, most website visitors indicated that their detailed interactions with a website should only be used by the website and not be shared with a party they know nothing about.[59] Thus, website visitors reasonably

---

[56] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Apr. 30, 2024).

[57] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records* (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200 (last visited Apr. 30, 2024).

[58] *Id.*

[59] *See Privacy and Online Tracking Perceptions Survey Report* (March 2020), CUJOAI, at 15–19, Privacy Survey_03-24 (cujo.com) (indicating major concerns of survey respondents was illegal use of data and unethical tracking and indicating respondents' belief that responsibility allocation falls on websites, and Internet users should be able to turn to the websites themselves, for privacy breaches).

expect that their interactions with a website should not be released to third parties unless explicitly stated.[60]

142.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[61] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[62] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[63] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[64]

143.    Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[65]

144.    Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

---

[60] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).
[61] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] Margaret Taylor, *How Apple screwed Facebook* (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

**J.** **Defendant's Conduct Violates HIPAA**

145.   Under HIPAA, individuals' health information must be:

properly protected while allowing the flow of health information needed to
provide and promote high quality health care and to protect the public's health
and well-being. The [Privacy] Rule strikes a balance that permits important
uses of information, while protecting the privacy of people who seek care and
healing.[66]

146.   HIPAA "is a federal law that required the creation of national standards to
protect sensitive patient health information from being disclosed without the patient's
consent or knowledge."[67] The rule requires appropriate administrative, physical, and
technical safeguards to ensure the confidentiality, integrity, and security of electronic
protected health information.[68]

147.   HIPAA defines "protected health information" as "individually identifiable
health information" that is "created or received by a health care provider" (or similar
entities) that "[r]elates to past, present, or future physical or mental health or condition of
an individual; the provision of health care to an individual; or the past, present, or future
payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Identifiers
such as patient-status (i.e., information that connects a particular user to a particular health

---

[66] *Summary of the HIPAA Privacy Rule* (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-
professionals/privacy/laws-regulations/index.html (last visited Apr. 27, 2024).
[67] *Health Insurance Portability and Accountability Act of 1996 (HIPAA)* (June 27, 2022),
https://www.cdc.gov/phlp/publications/topic/
hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20A
ct%20of%201996%20(HIPAA),-
On%20This%20Page&text=The%20Health%20Insurance%20Portability
%20and,the%20patient's%20consent%20or%20knowledge (last visited Apr. 29, 2024).
[68] *See supra*, note 57.

care provider), medical conditions, health symptoms, treatments, and physicians, gathered in this case by the Tracking Tools through Hennepin's Website, constitute protected health information.

148. To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect. According to the U.S. Department of Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), HIPAA covered entities cannot share PHI or PII to online tracking technology vendors for marketing purposes without first obtaining the individual's HIPAA-compliant authorization.[69] The HHS Privacy Bulletin explicitly states:

> The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[70]

149. The HHS Privacy Bulletin also identifies several harms that may result from an impermissible disclosure of an individual's PHI, including:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures

---

[69] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra*, note 7.
[70] *Id.* (internal citations omitted) (emphasis in original).

can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.

While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[71]

150.    According to HHS, "[s]ome regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps." The "information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[72]

151.    Individually identifiable health information ("IIHI") "collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[73]

152.    Thus, when a regulated entity, again like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is

---

[71] *Id.* (internal citations omitted) (emphasis in original).

[72] *Id.*

[73] *Id.*

indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

153.    Further, the HHS Privacy Bulletin makes clear that the use of tracking technologies on the public-facing or "unauthenticated" portion of a hospital's website can likewise result in the unlawful disclosure of PHI.  According to the HHS Privacy Bulletin, "in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[74] For example, "if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[75]

154.    When Plaintiffs communicated with Hennepin regarding "treatment options" and other health-related information on the Hennepin Website, the Tracking Tools intercepted and disclosed those communications to Meta and Google in violation of HIPAA's Privacy Rule.

---

[74] *Id.*
[75] *Id.*

## CLASS ACTION ALLEGATIONS

155.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all others similar situated,

156.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Personal
> Information was disclosed to a third party through Defendant's
> Website without authorization or consent during the applicable
> statute of limitations period.

157.    The Minnesota Sub-Class that Plaintiffs seek to represent is defined as

follows:

> All individuals residing in the State of Minnesota whose
> Personal Information was disclosed to a third party through
> Defendant's Website without authorization or consent during
> the applicable statute of limitations period.

158.    Excluded from the Classes is Defendant; officers, directors, and employees

of Defendant; any entity in which Defendant has a controlling interest in, is a parent or

subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates,

legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also

excluded are the Judges and Court personnel in this case and any members of their

immediate families.

159.    Plaintiffs reserve the right to modify and/or amend the Class definition, as

necessary.

160.    All members of the proposed Class are readily identifiable through

Defendant's records.

161.   All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

162.   **Numerosity**.  The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Classes includes tens of thousands of people based on Hennepin's numerous facilities throughout Hennepin County. The precise number of the Class Members is unknown to the Plaintiffs but may be ascertained from Defendant's records.

163.   **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and the Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

      a.    Whether Plaintiffs' and Class Members' private communications were intercepted, recorded, and disclosed;

      b.    Whether the interception, recording, and disclosure of Plaintiffs' and Class Members' communications was consensual;

      c.    Whether Defendant owed Plaintiffs and the other Class Members a duty to adequately protect their Personal Information;

      d.    Whether Defendant owed Plaintiffs and the other Class Members a duty to secure their Personal Information from interception and disclosure via third-party tracking technologies;

      e.    Whether Defendant owed Plaintiffs and the other Class Members a duty to implement reasonable data privacy protection measures

because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiffs and the Classes;

f.    Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

g.    Whether Defendant breached its duty to protect the Personal Information of Plaintiffs and the other Class Members;

h.    Whether Defendant knew or should have known about the inadequacies of its privacy protection;

i.    Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiffs' and the Classes' Personal Information from unauthorized disclosure;

j.    Whether proper data security measures, policies, procedures, and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiffs' and the Classes' Personal Information from unauthorized disclosure;

k.    Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Classes' injuries;

l.    Whether Plaintiffs and the Class Members had a reasonable expectation of privacy in their Personal Information;

m.    Whether Plaintiffs and the Class Members suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

n.  Whether Plaintiffs and the Class Members are entitled to recover damages; and

o.  Whether Plaintiffs and the Class Members are entitled to other appropriate remedies including injunctive relief.

164.  Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

165.  **Typicality.**  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Personal Information, like that of every other Class Member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

166.  **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

167.  **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be

no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

168.    Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with injuries similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## LEGAL CLAIMS

### COUNT I
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1)**
**(By Plaintiffs and on behalf of the Class)**

169.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

170.    The Electronic Communications Privacy Act ("ECPA") protects against the intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* 18 U.S.C. § 2511(1)(a).

171.    The ECPA further provides any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

*Id.* §§ 2511(1)(c) & (d).

172.    The primary purpose of the ECPA is to protect the privacy and security of communications as technology evolves.

173.    Section 2520 provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used. Specifically,

Section 2520 states that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [Chapter 119] may in a civil action recover from the person or entity . . ., which engaged in that violation" in a civil action. *Id.* § 2520(a).

174.    Section 2520 provides for $10,000 in statutory damages for violations of ECPA. *Id.* § 2520(c)(2)(B).

175.    The ECPA defines "intercept[ion]" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

176.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8).

177.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." *Id*. § 2510(12).

178.    "Electronic, mechanical or other device" means "any device or apparatus which can be used to intercept . . . electronic communication[s]." *Id.* § 2510(5). Here, Plaintiffs' and the Class Members' browsers and computing devices and Defendant's webservers, Website, and Pixel code and other tracking technologies Defendant deployed are all "devices" for the purposes of the ECPA.

179.   The transmissions of PII and PHI from Plaintiffs and the Class Members to Defendant through Defendant's Web Properties are "electronic communications" under the ECPA. *See id*. § 2510(12).   The information transmitted by Plaintiffs and the Class Members included, but was not limited to, information regarding patient status, past and current health conditions and symptoms, treatments and care options, physicians, location, and other sensitive information.

180.   Additionally, through its use of the Tracking Tools, Defendant intercepted and disclosed the communications about patient status, health conditions and symptoms, and other Personal Information Plaintiffs searched for on Defendant's Web Properties. This information was, in turn, used by third-parties, such as Meta and Google, to 1) place Plaintiffs in specific health-related categories; and 2) target Plaintiffs with particular advertising associated with Plaintiffs' particular health conditions. Defendant knowingly transmitted this data and did so for the purpose of financial gain.

181.   By embedding and deploying the Tracking Tools on Defendant's Web Properties, Defendant intentionally violated the ECPA, through its interception, attempt at interception, and its procurement of third parties to intercept the electronic communications of Plaintiffs and the Class Members. Defendant also intentionally used or attempted to use the contents of Plaintiffs' and the Class Members' electronic communications, knowing that the information was obtained through interception. Defendant's use of the intercepted information and data for its own advertising and data analytics, in the absence of express written consent, violated ECPA.

182.   Further, by embedding the Tracking Tools on its Web Properties and disclosing the content of patient communications relating to Personal Information, without consent, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws, including:

    a.   An invasion of privacy;

    b.   A violation of the Minnesota Uniform Deceptive Trade Practices Act, Mn. Stat. §325D.43-48;

    c.   A violation of 42 U.S.C. § 1320d–6, the Administrative Simplification subtitle of HIPAA, which protects against the disclosure of individually identifiable health information to another person and is a criminal offense punishable by fine or imprisonment; and

    d.   A violation of HIPAA.

183.   Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.  The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).

184.   42 U.S.C. § 1320d-6(a)(3) provides criminal and civil penalties against a healthcare provider who "knowingly . . . discloses individually identifiable health information to another person." Section 1320d(6) of HIPAA defines individually identifiable health information ("IIHI") as:

any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual,* or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6) (emphasis added).

185.    Guidance issued by HHS confirms that the Tracking Tools deployed by Defendant violate HIPAA.  HIPAA prohibits disclosing patients' health information via tracking technologies on both user-authenticated webpages (such as the log-in portal) and unauthenticated webpages. The guidance includes in the definition of IIHI the types of information intercepted by the Tracking Tools on Defendant's Web Properties, including information that "relates to the past, present, or future physical or mental health or condition of an individual," such as information about a person's symptoms, conditions, treatments, and physicians.  Defendant's use of the Tracking Tools violates HIPAA because the Meta Pixel and the other Tracking Tools also transmit information that "identifies the individual" or, at a minimum, "there is a reasonable basis to believe that the information can be used to identify the individual," such as through unique identifying cookies and users' IP addresses.  As described above, Plaintiffs entered data on Defendant's Web Properties relating to health conditions and other Personal Information, and later received related advertisements from Hennepin. This shows that through the Tracking Tools employed, Defendant disclosed the individually identifiable health information of its Web Properties visitors to third parties in violation of the ECPA.

186.    At no time did Plaintiffs and the Class Members provide their consent to Defendant's disclosure of their Personal Information to Meta, Google, and/or other third parties. Plaintiffs and the Class had a reasonable expectation that Defendant would not re-direct their communications content to Meta, Google, or others attached to their personal identifiers in the absence of their knowledge or consent.

187.    Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Class Members' privacy in its use of their data for its economic value.

188.    Defendant knew that such conduct would be highly offensive. Regardless, it proceeded to embed the Tracking Tools and use them to the detriment of visitors to its Web Properties.

189.    Plaintiffs and the Class Members are entitled to damages, including statutory, compensatory and/or nominal damages in an amount to be proven at trial.

190.    Defendant's conduct is ongoing, and it continues to unlawfully disclose and use the intercepted communications of Plaintiffs and the Class Members any time they provide information to Defendant through its Web Properties without their consent. Plaintiffs and the Class Members are therefore entitled to declaratory and injunctive relief. Such relief will prevent future unlawful and unauthorized disclosure of Plaintiffs' and the Class Members' Personal Information.

## COUNT II
### Violation of the Minnesota Wiretap Statute
### Chapter 626A.02
### (By Plaintiffs and on behalf of the Minnesota Subclass)

191.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

192.    The Minnesota Wiretap Statute, Minn. Stat. 626A, protects against the intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* Minn. Stat. 626A.02, Subd. 1. 150.

193.    The Minnesota Wiretap Statute further provides any person who:

(2) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

    (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
    (ii) such device transmits communications by radio, or interferes with the transmission of such communication;

(3) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(4) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

Minn. Stat. 626A.02.

194.   Additionally, a person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of Chapter 626A may recover from the person or entity that engaged in violation:

> 1. Temporary and other equitable or declaratory relief as may be appropriate;
> 2. Damages under subd. 3 …; and
> 3. A reasonable attorney's fee and other litigation costs reasonable incurred.

Minn. Stat. 626A.13, Subd. 2.

195.   The transmission of Plaintiffs' and the Minnesota Class members' Personal Information violates the Minnesota Wiretap Act. First, the transmissions from Plaintiffs and the Minnesota Class members to Defendant, through Defendant's Web Properties (www.hennepinhealthcare.org and www.hennepinhealthcare.org/mychart/) are wire communications pursuant to Minn. Stat. 626A.01, Subd. 3.

196.   "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Minn. Stat. 626A.01, Subd. 5.

197.   "Contents" means "when used with respect to any wire, electronic, or oral communication, includes any information concerning the substance, purport, or meaning of that communication." Minn. Stat. 626A.01, Subd. 8.

198.   "Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire, electronic, or oral communication. Minn. Stat. 626A.01, Subd. 6. Here, Plaintiffs' and the Minnesota Class members' browsers and

computing devices and Defendant's webservers, website, and the Pixel code Defendant deployed are all "devices" for the purposes of the Minnesota Wiretap Statute.

199. "Electronic communication" means transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system but does not include:

> (1) a wire or oral communication;

> (2) a communication made through a tone-only paging device; or

> (3) a communication from a tracking device, defined as an electronic or mechanical device which permits the tracking of the movement of a person or object.

Minn. Stat. 626A.01, Subd. 14.

200. By employing and embedding Pixel on Defendant's Web Properties, Defendant intentionally violated the Minnesota Wiretap Statute, through its interception, attempt at interception, and its procurement by Meta to intercept the electronic communications of Plaintiffs and the Minnesota Class members.

201. Indeed, Defendant willfully used or attempted to use the contents of Plaintiffs' and the Minnesota Class members' electronic communications, knowing that the information was obtained through interception.

202. Defendant's use of Pixel unlawfully and intentionally disclosed Plaintiffs' and the Minnesota Class members' Personal Information to Meta, including but certainly not limited to, information regarding treatments, scheduling, locations, procedures, medical providers, and diagnosis. These intentional acts violate Minn. Stat. 626A.02.

203.    Additionally, Defendant had no legitimate purpose for intentionally intercepting the contents of Plaintiffs' and the Minnesota Class members' private, and personal electronic communications. And even if Defendant could identify some legitimate purpose, which seems highly unlikely, it would not outweigh the egregious breach and invasion of privacy Defendant has committed against Plaintiffs and the Minnesota Class members.

204.    At no time did Plaintiffs and the Minnesota Class members provide their consent to Defendant's disclosure of their Personal Information to Meta and/or other third-parties. 162. Further, Defendant has improperly profited from its invasion of Plaintiffs' and the Minnesota Class members' privacy in its use of their data for its economic value.

205.    Plaintiff and the Minnesota Class members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

206.    To the extent Defendant's conduct is ongoing, and it continues to unlawfully disclose the communications of Plaintiffs and the Minnesota Class members any time they use or provide information to Defendant through its Web Properties or application without their consent, Plaintiffs and the Minnesota Class members are entitled to declaratory and injunctive relief. This will prevent future unlawful and unauthorized disclosure of Plaintiffs' and the Minnesota Class members' Personal Information.

207.    Pursuant to Minn. Stat. 626A.13, Subd. 3, the Court may assess damages by: (1) the sum of three times the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (2) statutory damages of whichever is the

greater of $100 a day for each day of violation or $10,000, whichever is greater of option (1) and option (2).

208.    As a direct and proximate result of Defendant's conduct and pursuant to the Minnesota Wiretap Act, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III
### Invasion of Privacy
### (By Plaintiffs and on behalf of the Class)

209.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

210.    The Personal Information of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

211.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Personal Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

212.    Defendant owed a duty to Plaintiffs and Class Members to keep their Personal Information confidential.

213.    Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Personal Information to Meta and Google, two of the largest advertising companies in the world, is highly offensive to a reasonable person.

214.   Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Personal Information constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

215.   Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Meta and Google's simultaneous collection and exploitation of confidential communications.

216.   Defendant failed to protect Plaintiffs' and Class Members' Personal Information and acted knowingly when it installed the Tracking Tools onto its Web Properties because the purpose of the Tracking Tools is to track and disseminate individual's communications with the Web Properties for the purpose of marketing and advertising.

217.   Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Web Properties and encouraged patients to use that Web Properties for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

218.   As a proximate result of Defendant's acts and omissions, the private and sensitive Personal Information of Plaintiffs and Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

219.   Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy

interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

220.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Personal Information is still maintained by Defendant and still in the possession of Meta and Google and the wrongful disclosure of the information cannot be undone.

221.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

222.    Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Personal Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**<ins>COUNT IV</ins>**
**Negligence**
**(By Plaintiffs and on behalf of the Nationwide Class)**

223.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

224.    Medical providers have a duty to their patient to keep their patients' Personal Information completely confidential. *See* Minn. Stat. § 144.651 subd. 15-16; Minn. Stat. § 144.293.

225.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Web Properties.

226.    Contrary to its duties as a medical provider, Defendant negligently installed the Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Personal Information and the contents of such information.

227.    These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

228.    The third-party recipients included, but may not be limited to, Meta and Google.

229.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    a.    Personal Information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.    Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.    Defendant eroded the essential confidential nature of the provider-patient relationship;

d.    Plaintiffs and Class Members have suffered general and compensatory damages that were proximately caused by Defendant's negligence, in an amount to be determined by a jury;

e.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

f.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

g.    Defendant's negligent actions diminished the value of Plaintiffs' and Class Members' Personal Information; and

h.    Defendant's breach of its duties as a medical provider was the proximate cause of Plaintiffs' and Class Members' injuries. But for Defendant's decision to install the invisible Tracking Tools on its Web Properties, Plaintiffs' and Class Members' Personal Information would not have been shared without their consent with Meta and other unauthorized third parties.

## <u>COUNT V</u>
### Breach of Implied Contract
### (By Plaintiffs and on behalf of the Nationwide Class)

230.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

231.    As a condition of utilizing Defendant's Web Properties and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and Class Members provided their Personal Information and compensation for their medical care.

232.    When Plaintiffs and Class Members provided their Personal Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Personal Information without consent.

233.    Plaintiffs and Class Members would not have entrusted Defendant with their Personal Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Personal Information without consent.

234.    Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Personal Information without consent.

235.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Personal Information without consent to third parties like Meta and Google.

236.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged in this Complaint, including, but not limited to, the loss of the benefit of their bargain and diminution in value of Personal Information.

237.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT VI
**Unjust Enrichment**
**(By Plaintiffs and on behalf of the Nationwide Class)**

238.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

239.    Defendant benefits from the use of Plaintiffs' and Class Members' Personal Information and unjustly retained those benefits at their expense.

240.    Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Personal Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

241.    Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

242.    The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Minnesota and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

243.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VII
### Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Mn. Stat. §325D.43-48
### (By Plaintiffs and on behalf of the Minnesota Class)

244.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

245.    The MUDTPA prohibits deceptive trade practices in person's business, vocation, or occupation. *See* Minn. Stat. §325D.44, subd. 1.

246.    Defendant is subject to the rules and statutory requirements of Minn. Stat. §325D.44 because it advertised, offered, or sold goods or services in Minnesota and therefore engaged in business directly or indirectly affecting the people of Minnesota.

247.    Defendant violated Minn. Stat. §325D.44, including, but not limited to, the provisions where the person:

represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; Minn. Stat. §325D.44, subd.1(5).

represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. Minn. Stat. §325D.44, subd.1(7).

248.    Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Sections Minn. Stat. § 325D.44, subd. 1(5) & (7).

249.    Defendant's representations and omissions include both implicit and explicit representations through:

a.    Failing to implement and maintain reasonable privacy measures to protect Plaintiffs' and the Minnesota Class's Personal Information, which was a direct and proximate cause of the Privacy violations described herein;

b.    Failing to identify and remediate foreseeable privacy risks and adequately maintain privacy measures despite knowing the risk of disclosure of patients' Personal Information, which was a direct and proximate cause of the Privacy violations;

c.    Failing to comply with common law and statutory duties pertaining to the privacy of Plaintiffs' and the Minnesota Class's Personal Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.102 and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Privacy violations;

d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and the Minnesota Class's Personal Information, including by implementing and maintaining reasonable privacy protection measures;

e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the privacy of Plaintiffs' and the Minnesota Class's Personal Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.10;

f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately protect Plaintiffs' and the Minnesota Class's Personal Information; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Minnesota Class's Personal

Information, including duties imposed by HIPAA, 45 C.F.R. § 160.102 or the FTC Act, 15 U.S.C. § 45.

250.   Defendant's acts and practices were deceptive and unfair because Defendant knew its Web Properties contained the Pixel and Google tracking tools and also knew that the Pixel and Google tracking tools would be unknown and/or not easily discoverable by Plaintiffs and Class Members, that Defendant's actions caused or were likely to cause substantial injury to patients which was not reasonably avoidable by patients themselves and not outweighed by countervailing benefits to patients or to competition.

251.   The injury to patients from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their Personal Information.

252.   Plaintiffs and the Minnesota Class could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of patient healthcare decision-making and information gathering. By withholding important information from patients about the inadequacy of its privacy protections and Defendant's intentional use of Pixel and Google tracking tools on its Web Properties, Defendant created an asymmetry of information between it and patients that precluded patients from taking action to avoid or mitigate injury.

253.   Defendant also engaged in "deceptive" acts and practices in violation of Minn. Stat. § 325D.44, including:

     a.    Misrepresenting that the subject of a consumer transaction has performance, characteristics, or benefits it does not have which the supplier knows or should reasonably know it does not have; and

      b.    Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

254.   Had Defendant disclosed to Plaintiffs and the Minnesota Class that it used the Meta Pixel which publicly disclosed sensitive, medical information, Defendant would have been unable to continue this type of business practice and it would have been forced to adopt reasonable data privacy measures and comply with the law. Defendant was trusted with sensitive and valuable PII and PHI regarding millions of patients, including Plaintiffs and the Minnesota Class. Defendant accepted the responsibility of protecting the data while keeping the state of the tracking technologies used on its site and application secret from the public.

255.   Accordingly, Plaintiffs and the Minnesota Class acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

256.   Defendant had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the PII and PHI in its possession, and the generally accepted professional standards. This duty arose due to the representations and relationship between Defendant and Plaintiffs and the Minnesota Class as described herein. Defendant had exclusive or superior knowledge of the practices engaged in where private information related to health and safety was shared with third parties which Plaintiffs and the members of the Minnesota Class had no reasonable manner of obtaining in advance, giving rise to a further duty to disclose.

257.    As a result of Defendant's wrongful conduct, Plaintiffs and the Minnesota Class were injured in that they never would have provided their PII and PHI to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their PII and PHI from being hacked and taken and misused by others.

258.    As a direct and proximate result of Defendant's violations of the MUDTPA, Plaintiffs and the Minnesota Class have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiffs and the Minnesota Class would not have made had they known of Defendant's inadequate data security; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use of their PII and PHI, entitling them to damages in an amount to be proven at trial.

259.    Plaintiffs and the Minnesota Class are at risk of future damage and harm from Defendant's deceptive and unfair practices because they are or may become patients of Defendant in the future and may have little choice but to continue to use Defendant's Web Properties to receive proper and complete medical care.

260.    Plaintiffs and the Minnesota Class seek all relief allowed by law, including reasonable attorneys' fees and costs and injunctive relief.

### COUNT VIII
**Violation of the Minnesota Consumer Fraud Act**
**Minn. Stat. § 325F.69 *et seq*.**
**(By Plaintiffs and on behalf of the Minnesota Class)**

261.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

262. Defendant's practices were and are in violation of Minnesota's Consumer Fraud Act, Minnesota Statutes § 325F.69, *et seq*.

263. Defendant is a person as defined by Minnesota Statute § 325F.68, subd. 3.

264. The medical services that Defendant markets, provides, offers, and/or sells are considered merchandise. Minnesota Statute §325F.69, Subd. 2.

265. As alleged, Defendant engaged in deceptive acts and practices in the form of misrepresentations and omissions while conducting business throughout Minnesota to thousands of individuals seeking medical care. Specifically, Defendant represented that it lawfully, and in accordance with healthcare standard practices, protected the confidentiality and privacy of its patients and also omitted material information regarding its use of Meta Pixel on its website to the public at large. Defendant did not protect the confidentiality or privacy of its patients and it does in fact use Meta Pixel on its website which the general public can access online.

266. Defendant did not disclose its use of the Meta Pixel on its website or that it was sharing private, sensitive patient data with third-party Meta without the patients' consent. Defendant's failure to inform patients or potential patients of its use of Meta Pixel on its website and its disclosure of patient and website visitors' data to third parties was likely to, and did, deceive Plaintiff and the Class members.

267. As a direct result of Defendant's unlawful deceptive practices, Plaintiffs and the Minnesota Class members suffered injuries including the loss of their personal, private data.

268.    Plaintiffs and the Minnesota Class members seek an award of damages for violations of Minn. Stat. § 325.69 pursuant to Minn. Stat. § 8.31, subd. 3a and all other appropriate relief.

## COUNT IX
### Violation of the Minnesota Health Records Act
### (Minn. Stat. §144.291, *et seq.*)
### (On behalf of Plaintiffs and the Minnesota Subclass)

269.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

270.    The Minnesota Health Records Act (the "MHRA") prohibits the release of patient "health records" absent signed consent. *See* Minn. Stat. § 144.293.

271.    The MHRA defines "health record" broadly to include "***any information***, whether oral or recorded in any form or medium that ***relates to*** the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment of provision of healthcare to a patient." Minn. Stat. § 144.291, subd. 2(c) (emphasis added).

272.    The Personal Information of Plaintiffs and Minnesota Class Members that was surreptitiously recorded and transmitted to Facebook via Defendant's Pixel and CAPI falls within the definition of "Health Records" as that term is defined by the MHRA.

273.    Plaintiffs and Minnesota Class Members are "patients" as that term is defined under the MHRA at all times relevant under Minn. Stat. §144.291, subd. 2(g).

274.    Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the

patient or the patient's legally authorized representative's consent, specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Sta. §144.293, subd. 2(1-3).

275.    Through the Pixel and other third-party trackers, Defendant released Plaintiffs' and Minnesota Class Members' health records to Facebook, including their specific medical conditions, treatments and providers sought, as detailed herein.

276.    Neither Plaintiffs nor Minnesota Class Members consented to have their records released via the Pixel or CAPI.

277.    Defendant's installation of the Pixel and other third-party trackers on its Website constitutes an "affirmative" release under Minnesota law. *See Larson v. Nw. Mut. Ins. Co.*, 855 N.W.2d 293, 302 (Minn. 2014).

278.    Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently or intentionally releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorneys' fees. Minn. Stat. §144.298, subd. 2.

279.    Plaintiffs have suffered compensatory damage including, but not limited to, invasion of their privacy, loss of value of their Personal Information, directed harassing and spam Facebook advertisements, and the mental and emotional anguish caused by Defendant's surreptitious recording and transmittal of their Personal Information, including medical diagnoses, to Facebook.

280.    As a result of Defendant's violations of the MHRA, Plaintiffs and Minnesota Class Members seek all damages authorized by law, including compensatory damages, costs, and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.    Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.    Designation of Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel;

c.    An award of damages in an amount to be determined at trial or by this Court;

d.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

e.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

f.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

g.    Awarding Plaintiffs and the Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

h.    Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

i.    Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

j.    Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

Dated: June 4, 2024

*/s/ Hart L. Robinovitch*
Hart L. Robinovitch (MN Bar No. 0240515)
Ryan J. Ellersick (*pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
hart.robinovitch@zimmreed.com
ryan.ellersick@zimmreed.com

Brian C. Gudmundson (MN Bar No. 0336695)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com

David S. Almeida (*pro hac vice* forthcoming)
Elena A. Belov (*pro hac vice* forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com

*Attorneys for Plaintiffs and the Putative Class*